UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| ADAM DAVID BODENBACH,<br><br>             Petitioner,<br><br>   v.<br><br>RANDY VALLEY,<br><br>             Respondent. | Case No. 1:23-cv-00303-REP<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is a Petition for Writ of Habeas Corpus, filed by Idaho prisoner Adam David Bodenbach ("Petitioner" or "Bodenbach"), challenging Petitioner's Idaho state conviction of first-degree murder following a trial in which Petitioner claimed that he acted in self-defense. Dkt. 1. The Court previously dismissed Claims 2, 3, and 5 as procedurally defaulted without excuse. Dkt. 19. The remaining claims in the Petition—Claims 1 and 4—are now fully briefed and ripe for adjudication on the merits.

All parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Dkt. 7. Having carefully reviewed the record in this matter, including the state court record,[1] the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d).

---

[1] The Court takes judicial notice of the records from Petitioner's state court proceedings. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006).

For the reasons explained below, the Court will deny habeas corpus relief on Petitioner's remaining claims.

## BACKGROUND

Under 28 U.S.C. § 2254(e)(1), the following facts of Petitioner's case, as described by the Idaho Supreme Court and the Idaho Court of Appeals, are presumed correct, absent clear and convincing evidence to the contrary:

> In the early morning of January 6, 2017, Bodenbach shot and killed Ryan Harrison Banks (Banks) at the Park Village Apartments in Boise, Idaho. At the time of the killing, Bodenbach resided in a two-bedroom apartment that he shared with Jacob Kimsey (Kimsey). Banks lived in the same complex as Bodenbach and Kimsey but in an apartment that was across the courtyard from theirs.
>
> On January 5, 2017, sometime between 8:00 and 10:00 p.m., Bodenbach purchased and injected himself with cocaine. Bodenbach claimed that Kimsey also injected himself with cocaine around that time. Kimsey and Banks then drove to a convenience store to purchase alcohol before the two of them returned to the apartment Kimsey shared with Bodenbach. Around 10:00 p.m., Bodenbach and Kimsey began arguing about whether Bodenbach could borrow Kimsey's car. The argument escalated and Kimsey shoved Bodenbach away from him. Banks intervened and pushed Bodenbach back into Bodenbach's bedroom and onto the bed. Banks was on top of Bodenbach pinning him to the bed. Bodenbach testified that Banks was choking him.
>
> Kimsey pulled Banks off Bodenbach and walked him back to Banks' apartment across the courtyard. Kimsey testified that Banks was emotional after the altercation with Bodenbach. Kimsey stayed with Banks for approximately five minutes attempting to calm him down.
>
> Once he believed that Banks was no longer agitated, Kimsey went to check on Bodenbach. When Kimsey arrived at the apartment, he saw Bodenbach flipping his mattress over

MEMORANDUM DECISION AND ORDER - 2

and throwing clothes around in an effort to locate his pistol. Bodenbach accused Banks of stealing his gun. Kimsey decided to return to Banks' apartment, assuming Bodenbach would calm down.

According to Kimsey, Banks was still emotional upon his return. There is conflicting evidence as to whether Banks had a knife on him at this time. Kimsey testified during trial that he did not see a knife on Banks at any time that night. However, during his interview with the police the night of Banks' death, Kimsey stated that Banks had been carrying a knife before he was shot.

Bodenbach eventually found his gun. He testified he decided to go to Banks' apartment to check on Kimsey, as he was worried Banks might harm him. Bodenbach took his pistol and walked across the courtyard to Banks' apartment.

Kimsey's and Bodenbach's stories diverge at this point. Bodenbach testified at trial that he knocked on Banks' door, identifying himself and falsely saying that the police were with him. Bodenbach claimed that he stated this because he was concerned about what Banks might do. However, Kimsey testified as follows: He did not hear Bodenbach knocking. Rather, he and Banks had decided to go outside to smoke cigarettes. Kimsey opened the door for Banks and Banks walked out first, pausing after walking through the door. Once Kimsey walked through the door, he could see Bodenbach pointing a gun in their direction and heard Bodenbach yell at Banks, "You thought I was fucking kidding. You think I'm a fucking punk." Bodenbach testified that he never raised the gun but rather had it in his jacket pocket.

Banks said nothing in response to Bodenbach but lunged towards him. Once Banks moved towards Bodenbach, Kimsey could not see Bank's [sic] front or Bodenbach's gun. Bodenbach claimed that prior to Banks lunging at him, Banks reached down to his waistband and pulled out a knife. Banks pushed Bodenbach into a pillar. Bodenbach claimed it was at this time that he reached for his gun and shot Banks. Banks fell down. Bodenbach ran off. The shooting occurred shortly after midnight.

MEMORANDUM DECISION AND ORDER - 3

As he was returning to his apartment, Bodenbach called 911 and told the operator he had shot someone in the leg. (Banks had been shot in the chest.) Bodenbach then returned to his apartment and set his gun on a table. He testified that he was agitated and decided to take some Xanax to calm down. After purportedly taking the medication, Bodenbach went to check on Banks.

The Boise Police Department responded to multiple 911 calls. The officers encountered Bodenbach talking on a phone and holding a knife, which he later claimed to have found on the ground near where he shot Banks. He was ordered to drop the knife and was handcuffed. Banks was located in a neighbor's apartment. He was pronounced dead by paramedics at the scene.

Once Bodenbach was arrested, Bodenbach complained of pain in his neck and back. He was transported to St. Alphonsus Regional Medical Center where he was examined and held for several hours. Around 2:00 a.m. on January 6, 2017, Boise Police Detective Jason Pietrzak (Pietrzak) came to the hospital to interview Bodenbach. Bodenbach later testified he did not remember being interrogated by Pietrzak. After the interview, Bodenbach was discharged from the hospital and booked into the Ada County Jail.

*State v. Bodenbach (Bodenbach I)*, 448 P.3d 1005, 1009–10 (Idaho 2019) (footnote omitted).

Petitioner was charged with first-degree murder and possession of cocaine, along with a sentencing enhancement for use of a firearm. Before trial, Petitioner moved to suppress statements he made during his interview at the hospital, arguing that he was under the influence of Xanax and, therefore, did not knowingly and intelligently waive his *Miranda* rights. The trial court denied the motion, concluding that Petitioner was not under the influence of Xanax and, even if he were, the *Miranda* waiver was valid. *Id*. at 1010–11.

MEMORANDUM DECISION AND ORDER - 4

At trial, Petitioner did not testify during the initial presentation of his defense. After both parties rested their cases, the trial judge stated he "was considering giving an instruction to the jury that would not allow Bodenbach to claim self-defense if he had been the 'initial aggressor.'" *Id.* at 1011. Defense counsel generally objected to giving the instruction but acquiesced in the language of the instruction.

The trial court permitted Petitioner to reopen his case so he could testify in his own defense. Bodenbach testified about his use of cocaine and Xanax on the night of the incident:

> Q. Did you use any controlled substances?
>
> A. Yes, I did.
>
> Q. When was that?
>
> A. That was that evening probably between 8:00 and 10:00.
>
> Q. Okay. And what was that controlled substance that you used?
>
> A. I had used some cocaine that night.
>
> Q. Okay. Did you ingest any other controlled substance that day?
>
> A. I did later that night.
>
> Q. Okay.
>
> A. But we're talking 12:00, maybe. It was in the next day.
>
> Q. My question is, before the shooting, had you had any alcohol?
>
> A. No.

MEMORANDUM DECISION AND ORDER - 5

Q. Had you had any—and the only controlled substance was cocaine?

A. Before the shooting, yes.

….

Q. Had the cocaine that you did earlier in the night, did it still have any effect on you at the time of this argument?

A. Umm, maybe a little bit.

Q. How long does a dose of cocaine usually affect you?

A. Usually about 45 minutes.

….

Q. Do you take Xanax from time to time?

A. Yeah.

Q. And you had some Xanax in your apartment on the night of the 5th or the morning of the 6th?

A. Yeah.

Q. How many did you have?

A. I had two.

Q. When you take a Xanax, ordinarily, what's the dose you normally take?

A. I'd say anywhere from a half to 1 milligram.

Q. And what was the total dose you took after you disassembled your gun?

A. The total dose I took would have been 4 milligrams.

Q. So between eight and four times the normal amount?

A. Yeah.

Q. Why did you do that?

A. I was pretty frantic at that point and wanted to calm down.

Q. Did you know the police were going to be interviewing you shortly?

A. Yeah, I figured.

Q. Did you know what that amount of Xanax was going to do to you?

A. Yeah.

Q. Did you feel like you needed to do that for medicinal purposes?

A. I felt like I needed to take care of the way that I felt right then and there, and I wasn't really thinking beyond that.

….

Q. Do you remember riding in an ambulance to St. Alphonsus?

A. No.

Q. Why is that?

A. I believe that was because of the Xanax that I took.

*State's Lodging A-3* at 1268–69, 1275, 1287–88, 1291–92.

In response to Petitioner's testimony, the prosecution called expert witness Dr. Gary Dawson, a pharmacologist and toxicologist. Dr. Dawson "opined that cocaine provides an instantaneous high that lasts a relatively short period—typically an hour or less with an hour and a half being the maximum." *Bodenbach v. State (Bodenbach II)*, No. 49245, 2022 WL 17101456, at *2 (Idaho Ct. App. Nov. 22, 2022) (unpublished). Dr. Dawson also "opined that four milligrams is a huge dose for someone who does not

MEMORANDUM DECISION AND ORDER - 7

regularly take Xanax and that he would expect to see that person become unresponsive and sedated for possibly twelve to fourteen hours." *Id*. "Based upon his training and experience, and the accounts from eyewitnesses, Dr. Dawson did not believe Bodenbach was under the influence of Xanax after the shooting with a reasonable degree of medical certainty." *Id*.

Petitioner did not present the testimony of his own expert to rebut Dr. Dawson's testimony.

The trial court read the following initial aggressor instruction to the jury:

> To have the benefit of self-defense or the defense of another, the circumstances justifying a killing must be such as to render it unavoidable. If you believe from the evidence, and beyond a reasonable doubt, that the defendant was the initial aggressor to raise the threat or specter of deadly force with the apparent intent to take the life of the said deceased or to do him such serious bodily injury as might result in death, then he would not be permitted to excuse the killing on the ground of self-defense or the defense of another, even though he should thereafter have been compelled to act in his own defense or the defense of another, unless you find all of the following occurred:
>
> > 1. The defendant, in good faith first, withdraws from further aggressive action, and;
> >
> > 2. The defendant communicates his withdrawal from further aggressive action to the victim by word or act.

*Bodenbach I*, 448 P.3d at 1013.

The jury found Petitioner guilty on all counts. Petitioner was sentenced "to life in prison with twenty-five years fixed for the murder (including the sentencing enhancement

MEMORANDUM DECISION AND ORDER - 8

for use of a firearm) and to a concurrent seven years with three years fixed for the possession of a controlled substance." *Id*. at 1011.

Petitioner appealed, arguing (as pertinent here) that the initial aggressor instruction relieved the State of its burden of proof on an element of the offense. The Idaho Supreme Court affirmed, holding that although the instruction was erroneous, Petitioner had failed to show that he was prejudiced by the error. *Id*. at 1015–16.

Petitioner then pursued state post-conviction relief. He argued, among other things, that his trial counsel rendered ineffective assistance by failing to present the testimony of a toxicologist to rebut the testimony of Dr. Dawson with respect to Petitioner's alleged consumption of cocaine and Xanax. *Bodenbach II*, 2022 WL 17101456, at *1. In support of his claim, Petitioner presented the declaration of Dr. Loring Beals.

Dr. Beals opined as follows regarding Petitioner's cocaine use:

> With cocaine usage, common adverse side effects would include mental confusion, anxiety, agitation, and irritability. High doses can cause euphoric excitement or schizophrenic-like symptoms. Psychologic [sic] & physical dependence may lead to profound addiction. Hallucinations, paranoid delusions accompanied by aggressive behavior and personality changes.
>
> [Bodenbach] was reported to have aggressive behavior, mental confusion (he thought his mother was a psychologist, in fact a real estate agent), talked about himself rather than the shooting, drifting conversation, personality changes evidenced by crude language (l got my "shit" together; I'm "jacked"). He appeared to have been threatened with bodily harm. I believe his behaviors represented drug induced central nervous system impairment clouding his judgment, but not exhibiting malice aforethought.

MEMORANDUM DECISION AND ORDER - 9

*State's Lodging C-3* at 28–29.

Dr. Beals also opined as to Petitioner's alleged Xanax use. Accepting Petitioner's testimony that he ingested Xanax within five minutes after the shooting, Dr. Beals stated:

> I conclude [Petitioner] seemed familiar with this drug and its effects and appears to have been a frequent user. However, he had no prescription for the drug, a sedative/hypnotic anti-anxiety medication. A search of his apartment failed to find any. Nevertheless, this particular member of the class of benzodiazepines has a relatively long half-life of 11-27 hours, so would have been present in samples of urine obtained at St. Alphonsus at 1:03:00 MST on 01/06/17 ordered by Mark Burriesci, M.D.

*Id*. at 27.

Dr. Beals's declaration then falsely stated that Dr. Burriesci's order for a drug screening was "discontinued by Detective Officer Pietrzak." *Id*. In fact, Dr. Burriesci did *not* order a drug screen, but a metabolic panel—which does not test for controlled substances. The doctor testified at trial that he "did not have the technology to test for controlled substances other than alcohol in the blood." *State's Lodging C-2* at 66 n.11.

The state district court dismissed Petitioner's post-conviction petition. The Idaho Court of Appeals affirmed, and the Idaho Supreme Court denied review. *Bodenbach II*, 2022 WL 17101456, at *1; *State's Lodging D-8*.

In Claim 1 of the instant Petition, Petitioner asserts that the initial aggressor instruction violated his right to due process because it lowered the State's burden to prove the killing was unlawful. Claim 4 asserts that trial counsel should have retained a toxicologist to opine on Petitioner's use of cocaine and Xanax.

MEMORANDUM DECISION AND ORDER - 10

## HABEAS CORPUS STANDARD OF LAW

A federal court may grant habeas corpus relief when it determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). If the state court has adjudicated a claim on the merits, habeas relief is further limited by § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, federal habeas relief must be denied unless the state court's adjudication of the petitioner's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[2]

The term "unreasonable" in § 2254(d) is reserved for "extreme malfunctions in the state criminal justice system," not for "ordinary error" or even for cases "where the petitioner offers a strong case for relief." *Mays v. Hines*, 592 U.S.385, 391 (2021) (per curiam) (internal quotation marks omitted). Accordingly, a federal court reviewing a state court's adjudication of a claim on the merits "must carefully consider all the reasons and evidence supporting the state court's decision." *Id*. Courts are not permitted "to essentially evaluate the merits *de novo* by omitting inconvenient details from its analysis." *Id*. at 392 (internal quotation marks and alteration omitted). Instead, "[d]eciding whether a state court's decision involved an unreasonable application of

---

[2] Section 2254(d)(2) also permits habeas relief in certain circumstances where the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." However, Petitioner does not rely on subsection (d)(2) in this matter. *See generally* Dkt. 28.

federal law or was based on an unreasonable determination of fact requires the federal

habeas court to train its attention on the particular reasons—both legal and factual—why

state courts rejected a state prisoner's federal claims and to give appropriate deference to

that decision." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018) (internal quotation marks and

citations omitted).

A state court's decision is "contrary to" clearly established federal law "if the state

court applies a rule different from the governing law set forth in [the Supreme Court's]

cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of

materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). To satisfy the

"unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state

court—although identifying "the correct governing legal rule" from Supreme Court

precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state

prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1)

provides a remedy for instances in which a state court unreasonably applies [Supreme

Court] precedent; it does not require state courts to extend that precedent or license

federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 426

(2014) (emphasis omitted).

The AEDPA standard is extraordinarily high, and a federal court cannot grant

habeas relief simply because it concludes in its independent judgment that the state

court's decision is incorrect or wrong. Rather, the state court's application of federal law

must be objectively unreasonable to warrant relief. *Williams*, 529 U.S. at 411. If there is

*any* possibility that fair-minded jurists could disagree on the correctness of the state

MEMORANDUM DECISION AND ORDER - 12

court's decision, § 2254(d)(1) precludes relief. *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013); *Harrington v. Richter*, 562 U.S. 86, 101–02 (2011). In other words, if one fair-minded jurist could conclude that the state court's decision was correct, habeas relief must be denied—even if other fair-minded jurists would disagree.

"Clearly established federal law" means the governing legal principles set forth in the holdings—not the dicta—of the United States Supreme Court, as of the time the state court rendered its decision. *Williams*, 529 U.S. at 412. The habeas statute does not require an *identical* factual pattern before a legal rule must be applied. Rather, state courts must reasonably apply the rules squarely established by the Supreme Court's holdings to the facts of each case. *See White*, 572 U.S. at 427.

A federal habeas court "may not overrule a state court for … holding a view different from its own" when the precedent from the Supreme Court "is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003). Circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600–01 (9th Cir. 2000). But a federal court may not use circuit law to refine or sharpen a general principle of Supreme Court habeas corpus jurisprudence into a specific legal rule that the Supreme Court itself has not announced. *Lopez v. Smith*, 574 U.S. 1, 7 (2014) (per curiam).

If no Supreme Court decision has "confront[ed] the specific question presented by" a state prisoner's federal habeas petition—that is, if the circumstances of a petitioner's case are only generally similar to Supreme Court precedent—then the state

MEMORANDUM DECISION AND ORDER - 13

court's decision cannot be contrary to or an unreasonable application of any holding of the Supreme Court. *Woods v. Donald*, 575 U.S. 312, 317 (2015) (per curiam). By the same token, a state court cannot unreasonably apply established federal law that does not exist. *See, e.g., Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam) ("Because our cases give no clear answer to the question presented, … it cannot be said that the state court unreasonably applied clearly established Federal law.") (internal quotation marks and alterations omitted); *Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("No holding of this Court required the California Court of Appeal to apply the test of *Williams* and *Flynn* to the spectators' conduct here. Therefore, the state court's decision was not contrary to or an unreasonable application of clearly established federal law.").

If a petitioner satisfies § 2254(d), then the federal habeas court must review the petitioner's claim de novo, meaning without deference to the state court's decision. *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014). When considering a habeas claim de novo, a district court may, as in the pre-AEDPA era, draw from both United States Supreme Court and circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989), as modified by *Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021).

Generally, even if a petitioner succeeds in demonstrating a constitutional error in his conviction, he is entitled to federal habeas relief only if the petitioner "can establish that [the error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not harmless, and habeas relief must be granted, only if the federal court has "grave doubt about whether a trial error of federal

MEMORANDUM DECISION AND ORDER - 14

law had substantial and injurious effect or influence in determining the jury's verdict."
*O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted). A
"reasonable possibility" of prejudice is insufficient. *Brecht*, 507 U.S. at 637.

Because § 2254(d) applies to harmlessness determinations of state courts, a federal
court on habeas review cannot find an error prejudicial based solely on the *Brecht*
standard. Rather, "[w]hen a state court has ruled on the merits of a state prisoner's claim,
a federal court cannot grant relief without first applying both the test this Court outlined
in *Brecht* and the one Congress prescribed in AEDPA." *Brown v. Davenport*, 596 U.S.
118, 122 (2022).

Additionally, some types of claims "are analyzed under their own harmless error
standards, which can render *Brecht* analysis unnecessary." *Jackson v. Brown*, 513 F.3d
1057, 1070 (9th Cir. 2008). Ineffective assistance of counsel claims are included in this
category. *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) ("[W]here a habeas
petition governed by AEDPA alleges ineffective assistance of counsel under *Strickland v.
Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), we apply
*Strickland*'s prejudice standard and do not engage in a separate analysis applying the
*Brecht* standard.").

## DISCUSSION

**1.   Petitioner Is Not Entitled to Habeas Relief on Claim 1**

Claim 1 alleges a violation of the Due Process Clause based on the initial
aggressor jury instruction.

MEMORANDUM DECISION AND ORDER - 15

### A.    Clearly Established Law

Due process requires that, to convict a defendant, the State must prove beyond a reasonable doubt every essential element of the crime charged. *In re Winship*, 397 U.S. 358, 364, (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). A jury instruction that has the effect of relieving the State of this burden is unconstitutional. *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979).

State law defines the elements of a state crime. In Idaho, murder is defined as "the unlawful killing of a human being." Idaho Code § 18-4001. Because the unlawfulness of the killing is an element of murder in Idaho, the State must prove that the killing was unlawful. *See Bodenbach I*, 448 P.3d at 1015 ("[T]he lack of justification, i.e., whether the defendant killed in self-defense, is an essential element for a murder conviction."). Self-defense is a justification for killing. Idaho Code § 18-4009(1)(a) ("Homicide is justifiable when … resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person …."). That is, a killing committed in self-defense is not unlawful and, therefore, is not murder. Accordingly, the State was required to prove, beyond a reasonable doubt, that Petitioner did not act in self-defense.

Under Idaho law, for an initial aggressor to claim self-defense, the initial aggressor must withdraw from further aggressive action and must communicate that withdrawal to the victim. *Bodenbach I*, 448 P.3d at 1014–15.

MEMORANDUM DECISION AND ORDER - 16

### B.    State Court Decision

Because Petitioner did not preserve his challenge to the language of the initial aggressor instruction, the Idaho Supreme Court reviewed the claim for fundamental error. Under Idaho's fundamental error doctrine, a defendant can prevail on an unpreserved claim of constitutional error only if the defendant establishes that there was error, the error was obvious, and the error actually affected the outcome of the trial proceedings. *Id.* at 1015 (citing *State v. Perry*, 245 P.3d 961 (Idaho 2010), and *State v. Miller*, 443 P.3d 129 (Idaho 2019)).

The Idaho Supreme Court held that the initial aggressor instruction given in Petitioner's case was erroneous and that the error was obvious. Though the instruction accurately stated that an initial aggressor may claim self-defense if he withdraws from further aggressive action and communicates that withdrawal, the instruction also stated that "the circumstances justifying a killing must be such as to render it unavoidable." *Id.* at 1015. This was an incorrect statement of Idaho law. The state supreme court held that the instruction violated due process because it lessened the State's burden to prove that Petitioner did not act in self-defense.

However, the court went on to hold that Petitioner failed to satisfy the prejudice prong of the fundamental error analysis:

> Here, it is unlikely that the single sentence in the jury instruction actually affected the outcome of the trial proceedings. Other instructions given by the district court clearly outlined the law that the jury was required to apply. In order for the jury instruction to have been applicable, the jury would have had to find that Bodenbach was the initial aggressor. Then, in order to have the benefit of self-defense,

MEMORANDUM DECISION AND ORDER - 17

> the facts would have had to establish that Bodenbach's conduct satisfied the elements for an initial aggressor to claim self-defense. There is no evidence that Bodenbach attempted to withdraw from further struggle, let alone communicate that withdrawal to Banks. Therefore, Bodenbach failed to establish that the error actually affected the outcome of the trial. Accordingly, the jury instruction did not rise to the level of fundamental error.

*Id*. at 1015–16. Because Petitioner could not show that the error actually affected the outcome of his trial, the Idaho Supreme Court denied Claim 1.

### C.  The State Court's Rejection of Claim 1 Was Not Unreasonable under AEDPA

In *Chapman v. California*, the United States Supreme Court held that, if a constitutional error occurred at trial, the State must show on direct appeal that the error was "harmless beyond a reasonable doubt." 386 U.S. 18, 24 (1967). If the State fails to make this showing, a new trial is required.

Petitioner argues that the Idaho Supreme Court's rejection of Claim 1 was contrary to, or based on an unreasonable application of, *Chapman* because that court did not cite or apply *Chapman*. *See* Dkt. 28 at 11–12. The Court disagrees.

The United States Supreme Court has never held that the *Chapman* harmless-error standard applies to *unpreserved* claims of constitutional error. *See Ramirez v. Baker*, No. 3:13-cv-00025-MMD-CBC, 2019 WL 4017239, at *10 (D. Nev. Aug. 26, 2019) (unpublished), *aff'd*, 833 F. App'x 63 (9th Cir. 2020) ("The *Chapman* harmless-error standard applies where a timely objection was raised in the trial court and the error then is considered on a *de novo* review on direct appeal. Where a timely objection was *not* raised in the trial court, the *Chapman* harmless-error standard is inapplicable."). Indeed, in

MEMORANDUM DECISION AND ORDER - 18

federal criminal prosecutions, unpreserved claims of constitutional errors are reviewed only for plain error—which is similar to Idaho's fundamental error analysis—and are not subject to the *Chapman* standard. *See, e.g., United States v. Moreland*, 622 F.3d 1147, 1165–66 (9th Cir. 2010).

The Constitution simply does not require application of *Chapman* to unpreserved claims of error. Because no clearly established U.S. Supreme Court precedent required the Idaho Supreme Court to use the *Chapman* standard in the circumstances of Petitioner's case, the state court's decision was neither contrary to, nor based on an unreasonable application of, *Chapman* under § 2254(d)(1). *See Woods*, 575 U.S. at 317; *Wright*, 552 U.S. at 126, *Musladin*, 549 U.S. at 77.

Accordingly, Petitioner is not entitled to relief on his due process claim based on the initial aggressor instruction. Because Petitioner has not satisfied § 2254(d), the Court need not engage in a separate prejudice analysis under *Brecht*. *See Davenport*, 596 U.S. at 122 (2022) (holding that a court may not grant habeas relief unless a petitioner satisfies both § 2254(d) and *Brecht*).

## 2.    Petitioner Is Not Entitled to Habeas Relief on Claim 4

In Claim 4, Petitioner asserts his trial counsel was ineffective for failing to consult and present the testimony of a toxicologist or pharmacologist to rebut Dr. Dawson's testimony about Petitioner's use of cocaine and alleged use of Xanax on the night of the shooting.

MEMORANDUM DECISION AND ORDER - 19

#### A.    Clearly Established Law

The Sixth Amendment to the United States Constitution provides that a criminal defendant has a right to the effective assistance of counsel in his defense. The Supreme Court explained the standard for ineffective assistance claims in *Strickland v. Washington*, 466 U.S. 668 (1984).

A petitioner asserting ineffective assistance of counsel must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) those errors prejudiced the defendant by "depriv[ing] the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. A petitioner must establish both deficient performance and prejudice to prove an ineffective assistance claim. *Id.* at 697. On habeas review, a court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one prong is not satisfied and would compel denial of the ineffective assistance claim. *Id.*

Whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687–88. A reviewing court's inquiry into the reasonableness of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the

MEMORANDUM DECISION AND ORDER - 20

> difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense or which witnesses to present, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. Moreover, an attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690–91. That is, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."

*Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

MEMORANDUM DECISION AND ORDER - 21

The Ninth Circuit has provided some insight into the *Strickland* standard when evaluating an attorney's "strategy calls." These cases are instructive in the Court's assessment of whether the state court reasonably applied *Strickland*. *See Duhaime*, 200 F.3d at 600.

First, tactical decisions do not constitute ineffective assistance simply because, in retrospect, better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Second, a mere difference of opinion as to tactics does not render counsel's assistance ineffective. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981). Third, "counsel's investigation must determine trial strategy, not the other way around." *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017).

If a petitioner shows that counsel's performance was deficient, he must also show that the deficient performance caused prejudice. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To satisfy the prejudice standard, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. As the *Strickland* Court instructed:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly

MEMORANDUM DECISION AND ORDER - 22

> supported by the record is more likely to have been affected
> by errors than one with overwhelming record support. Taking
> the unaffected findings as a given, and taking due account of
> the effect of the errors on the remaining findings, a court
> making the prejudice inquiry must ask if the defendant has
> met the burden of showing that the decision reached would
> reasonably likely have been different absent the errors.

*Id.* at 695–96. To constitute *Strickland* prejudice, "[t]he likelihood of a different result

must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

The foregoing standard, giving deference to counsel's decision-making, is the de

novo standard of review. Another layer of deference—to the state court decision—is

afforded under AEDPA. In giving guidance to federal courts reviewing *Strickland* claims

on habeas corpus review, the United States Supreme Court has explained:

> The pivotal question is whether the state court's application
> of the *Strickland* standard was unreasonable. This is different
> from asking whether defense counsel's performance fell
> below *Strickland*'s standard. Were that the inquiry, the
> analysis would be no different than if, for example, this Court
> were adjudicating a *Strickland* claim on direct review of a
> criminal conviction in a United States district court. Under
> AEDPA, though, it is a necessary premise that the two
> questions are different. For purposes of § 2254(d)(1), "an
> unreasonable application of federal law is different from an
> incorrect application of federal law." *Williams*, *supra*, at 410,
> 120 S. Ct. 1495. A state court must be granted a deference
> and latitude that are not in operation when the case involves
> review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101. That is, when evaluating an ineffectiveness claim under

§ 2254(d), this Court's review of that claim must be "doubly deferential." *Cullen v.*

*Pinholster*, 563 U.S. 170, 190 (2011) (internal quotation marks omitted).

Because *Strickland* itself "is a general standard, a state court has even more latitude to

reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Indeed, "the more general the rule, the more leeway state courts have" in deciding constitutional claims. *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (per curiam) (internal quotation marks omitted).

**B.      State Court Decision**

The Idaho Court of Appeals considered Claim 4 on appeal from the dismissal of Petitioner's state post-conviction petition. That court cited *Strickland*, as well as numerous state court cases that applied *Strickland*:

> To prevail on an ineffective assistance of counsel claim, the petitioner must show that the attorney's performance was deficient and that the petitioner was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Self v. State*, 145 Idaho 578, 580, 181 P.3d 504, 506 (Ct. App. 2007). To establish a deficiency, the petitioner has the burden of showing that the attorney's representation fell below an objective standard of reasonableness. *Aragon v. State*, 114 Idaho 758, 760, 760 P.2d 1174, 1176 (1988); *Knutsen v. State*, 144 Idaho 433, 442, 163 P.3d 222, 231 (Ct. App. 2007). To establish prejudice, the petitioner must show a reasonable probability that, but for the attorney's deficient performance, the outcome of the trial would have been different. *Aragon*, 114 Idaho at 761, 760 P.2d at 1177; *Knutsen*, 144 Idaho at 442, 163 P.3d at 231. This Court has long adhered to the proposition that tactical or strategic decisions of trial counsel will not be second-guessed on appeal unless those decisions are based on inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. *Gonzales v. State*, 151 Idaho 168, 172, 254 P.3d 69, 73 (Ct. App. 2011).
>
> "The decision of what witnesses to call 'is an area where we will not second guess counsel without evidence of inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective evaluation.'" *State v. Payne*, 146 Idaho 548, 563, 199 P.3d 123, 138

MEMORANDUM DECISION AND ORDER - 24

> (2008) (quoting *State v. Larkin*, 102 Idaho 231, 234, 628 P.2d 1065, 1068 (1981)). We recognize that a defendant's lawyer does not always have a duty to consult experts when the government is proposing to put on expert witnesses. *Murphy v. State*, 143 Idaho 139, 146, 139 P.3d 741, 748 (Ct. App. 2006). "There may be no reason to question the validity of the government's proposed evidence or the evidence may be so weak that it can be demolished on cross-examination." *Id.* (quoting *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001)).

*Bodenbach II*, 2022 WL 17101456, at *3–4.

Petitioner argued that (1) "his cocaine consumption prior to the shooting inhibited his ability to form malice aforethought," and (2) he consumed Xanax after the shooting. *Id*. at *4. Petitioner claimed "a toxicologist could have shown that Bodenbach was under the influence of cocaine at the time of the shooting and that the Xanax mitigated the signs of cocaine use after the shooting." *Id*.

With respect to the cocaine issue, the Idaho Court of Appeals held that Dr. Beals's declaration about the effect of cocaine on chronic cocaine users was "not supported by the evidence" because it contradicted Petitioner's own testimony about "his personal experience with cocaine":

> Bodenbach testified that: he has a chronic addiction to cocaine; he used cocaine between 8:00 p.m. and 10:00 p.m.; cocaine typically affects him for about forty-five minutes with a pretty fast drop-off; he felt the effects of the cocaine "maybe a little bit" during his argument with Kimsey and Banks; and that after he found his handgun, he stayed in his apartment for about thirty to forty-five minutes before going to Banks' apartment.

*Id*. That is, "Bodenbach's own testimony show[ed] he was not under the influence of cocaine during the shooting at midnight." *Id*.

MEMORANDUM DECISION AND ORDER - 25

The state court held that trial counsel's decision not to proffer an expert witness regarding cocaine was "objectively reasonable," given that Petitioner's own testimony "denie[d] the influence of cocaine." *Id*. at *5. Additionally, Petitioner's defense counsel reasonably focused on self-defense, and although "the lack of malice aforethought could have been an alternative defense, … it [was] undercut by [Petitioner's] own testimony." *Id*. The court held Petitioner had not shown *Strickland* prejudice for the same reasons.

As for the Xanax question, Petitioner argued as follows:

> Bodenbach contends that proving he took Xanax was important to explain why he was not displaying effects of cocaine after the shooting, since Xanax would have mitigated the cocaine use. Next, Bodenbach asserts credibility was incredibly important for Bodenbach's claim of self-defense. The jury may not have believed Bodenbach's claim that Banks had a knife when Dr. Dawson undermined Bodenbach's credibility about taking Xanax. In essence, Dr. Dawson allegedly harmed Bodenbach's credibility to the jury. As such, Bodenbach argues expert testimony was necessary to help prove his claim that he took Xanax, which would have bolstered his credibility.

*Id*.

The Idaho Court of Appeals noted that "Dr. Beals never opined that Bodenbach's behavior was consistent with Xanax use but instead accepted Bodenbach's testimony that he consumed Xanax as fact." *Id*. In addition to finding fault with Dr. Beals's false statement regarding Dr. Burriesci's actions, the court also held that Dr. Beals's opinion "about hospital protocol and what a doctor should have administered is beyond his expertise and the scope of his testimony." *Id*.

The state court denied the ineffective assistance claim:

MEMORANDUM DECISION AND ORDER - 26

> Dr. Beals does not contradict or challenge Dr. Dawson's opining about the effects of Xanax; what symptoms he would expect to see from four milligrams; and how the facts in evidence about Bodenbach's affect and behavior do not suggest Xanax consumption. If a fact finder did not believe Bodenbach's testimony that he took Xanax, then Dr. Beals' comments are meaningless. Dr. Beals does not bolster Bodenbach's testimony as purported; Dr. Beals relies upon Bodenbach.

*Id*. Because Dr. Beals's declaration had "no rebuttal value," the Idaho Court of Appeals held that trial counsel was not ineffective in failing to present the testimony of a toxicology expert.

### C. The State Court's Rejection of Claim 4 Was Not Unreasonable under AEDPA

The Idaho Court of Appeals correctly cited *Strickland* as the controlling law on ineffective assistance claims and analyzed Petitioner's claim thoroughly. With respect to the cocaine issue, the state court's decision that counsel's choice not to focus on the lack of malice aforethought was reasonable.

*Strickland* gives a trial attorney wide discretion with respect to choosing a defense. *See Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998) (holding that counsel's failure to develop a mens rea defense was reasonable because such a defense "would have conflicted with the primary defense theory of misidentification"); *Turk v. White*, 116 F.3d, 1264, 1267 (9th Cir. 1997) (counsel's selection of self-defense theory was reasonable and obviated his need to investigate defendant's claim of incompetency). In Petitioner's case, a defense of lack of malice aforethought would have conflicted with his

MEMORANDUM DECISION AND ORDER - 27

theory of self-defense, and counsel provided objectively reasonable performance in deciding not to present evidence regarding the former.

As for Petitioner's alleged Xanax use, the Idaho Court of Appeals reasonably concluded that Dr. Beals's declaration had no rebuttal value. The declaration contained a false accusation against law enforcement and opined on areas outside of Dr. Beals's expertise. Dr. Beals did not actually opine that Petitioner's behavior was consistent with consumption of Xanax, but merely accepted Petitioner's testimony that he consumed Xanax. Though Dr. Beals was permitted to do so, the jury was not required to do the same. As the state court noted, if the jury disbelieved Petitioner's testimony that he took Xanax, Dr. Beals's declaration would have no relevance at all. Accordingly, Petitioner has not shown either that counsel's performance was deficient or that Petitioner suffered prejudice as a result.

Because fair-minded jurists could agree with the Idaho Court of Appeals that Petitioner did not establish ineffective assistance of counsel based on the failure to present the testimony of a toxicologist, *see Jackson*, 569 U.S. at 508–09, the state court's decision was not contrary to, nor based on an unreasonable application of, U.S. Supreme Court precedent.

### CONCLUSION

For the foregoing reasons, Petitioner has not established that he is entitled to habeas relief under 28 U.S.C. § 2254(d).

MEMORANDUM DECISION AND ORDER - 28

## ORDER

**IT IS ORDERED:**

1.     Claims 1 and 4 of the Petition for Writ of Habeas Corpus are DENIED. Because all other claims have already been dismissed, the Court will enter judgment in favor of Respondent.

2.     The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases.

DATED:  April 10, 2026

Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge

MEMORANDUM DECISION AND ORDER - 29